UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

RES-CARE, INC                                                                    PLAINTIFF

v.                                                          CIVIL ACTION NO. 3:03CV-338-S

MOUNTAIN STATE BLUE CROSS & BLUE SHIELD, INC.                    DEFENDANT

## MEMORANDUM OPINION

This matter is before the court on cross motions by the plaintiff, Res-Care, Inc. ("Res-Care"),

for partial summary judgment and by the defendant, Mountain State Blue Cross & Blue Shield, Inc.

("Mountain State"), for summary judgment. This case involves the plaintiff's claims for

reimbursement of healthcare expenses paid by the plaintiff in excess of the aggregate loss threshold

as well as for the return of overpaid fees and premiums from the defendant. For the reasons set

forth below, the plaintiff's motion is **GRANTED** and the defendant's motion is **DENIED** in part

and **GRANTED** in part**.**

## FACTS

In 2000, Res-Care provided health insurance to its employees through a self-funded plan.

Res-Care entered into a contract with Mountain State, establishing Mountain State as third party

administrator ("TPA") of the plan. Under the contract, Mountain State administered the benefits and

claims payment services for Res-Care's West Virginia employees for the year 2001. The plan was

funded by Res-Care's own contributions and by employee participants' payroll deductions. Res-Care

paid Mountain State fees for its TPA services, set at $27.25 per contract per month. Mountain State

also provided a "stop-loss" insurance policy to Res-Care. This policy took two forms. The first,

"specific" stop-loss insurance, guaranteed that Res-Care's maximum liability for an individual

participant would be $150,000.00. Mountain State assumed the risk for any amount exceeding that

individual threshold. Res-Care paid a monthly premium of $15.79 per employee for this coverage.

Res-Care paid a monthly premium of $7.05 per employee for the second type of coverage, termed "aggregate" stop-loss insurance.  Mountain State agreed to refund Res-Care any money paid for claims for the entire group exceeding the "aggregate loss threshold" at the end of the year.  This threshold amount was the product reached when multiplying the "individual attachment point"[1] by the number of eligible employees times the number of months of eligibility.

In May of 2002, Mountain State calculated the aggregate loss threshold and refunded Res-Care $260,544.21, the portion of total claims paid by Res-Care that exceeded the aggregate loss threshold.  Res-Care's own year-end calculations yielded a much higher reimbursement figure: $436,938.51.  This $176,394.30 difference results from a discrepancy in the number of eligible employees listed in Res-Care's records and that listed in Mountain State's records. Mountain State's calculations were based upon inaccurate information because its records included employees who had become ineligible during the year.  Res-Care contends that its determination should prevail because Res-Care alone had the ability to determine employee eligibility, and that the threshold calculation must be based on the correct year-end eligibility numbers.  Mountain State concedes that Res-Care certified eligibility, but claims this responsibility incorporated an implicit duty to notify Mountain State when employees became ineligible.  Mountain State asserts that Res-Care breached its duty when it failed to timely notify Mountain State of the termination of these disputed employees.  Therefore, Mountain State's motion asserts that Res-Care cannot recover in this action.  The opinion will discuss each motion separately.

## DISCUSSION

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[1] This variable is an actuarial prediction based upon the expected amount of claims.  The attachment point was determined by Mountain State and the parties do not dispute the numerical value to be used in the formula.

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party bears the burden of establishing these elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Not every factual dispute between the parties prevents summary judgment. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). To preclude summary judgment, the disputed facts must be material, such that "they might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The dispute must also be genuine, such that "if the facts were proven at trial, a reasonable jury could return a verdict for the non-moving party." *Id.* "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp.*, 822 F.2d at 1435. In making these determinations, the court views all facts and inferences in a light most favorable to the nonmoving party. *Id.* Review of cross motions for summary judgment requires the court to evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. *Wiley v. U.S.*, 20 F.3d 222, 224 (6th Cir. 1994).

### I. Plaintiff's Motion for Partial Summary Judgment

*(A) Express Contract Claim*

In its complaint, Res-Care seeks damages of $203,054.55, which includes overpaid fees and premiums as well as reimbursement for healthcare expenses paid by Res-Care in excess of the aggregate stop-loss threshold. Res-Care's summary judgment motion isolates the claim for reimbursement of the aggregate stop-loss proceeds, claiming it is entitled to $176,394.30 as a matter of law. To support its motion, Res-Care cites the well-established principle that a court must enforce the express terms of a contract. Res-Care relies on opinions holding that the court should not "alter, pervert, or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract." *Clark v. Blue Cross Blue Shield of West Virginia, Inc*., 510 S.E.2d 764,

787 (W. Va. 1998) (quoting *Cotiga Development Co. v. United Fuel Gas Co.*, 128 S.E.2d 626 (W. Va. 1962)).[2]  Res-Care points to such express language in the contract dubbing it Res-Care's responsibility to "[c]ertify the eligibility of participants to receive benefits under the Plan." *Administrative Services Agreement ("Agreement"),* ¶ I. B. 2. a.

Interpreting an insurance contract is purely a legal question.  *State Auto. Mutual Ins. Co. v. Alpha Engineering Services, Inc.*, 542 S.E.2d 876, 880 (W. Va. 2000). The court's "initial task in interpreting the provisions of an insurance policy is to determine whether the language of the instrument is so unequivocal as to leave no doubt concerning the meaning intended by the parties."*Arnold Agency v. West Virginia Lottery Com'n*, 526 S.E.2d 814, 825 (W. Va.1999). West Virginia courts have consistently held that "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." *State Auto.,* 542 S.E.2d at 880.

In the case at bar, the provision regarding determination of the aggregate loss threshold is unambiguous - it was to be determined at the end of the year, after all the medical claims had been paid.  "Inasmuch as the stop-loss is based on paid claims during a given Agreement Period and the need exists to make an expeditious settlement for each Agreement Period, the Agreement Period Settlement shall occur within ninety (90) days <u>following the end of each Agreement Period</u>." *Agreement at  Appendix B,* ¶ 16 (emphasis added).  The calculation depended upon employee eligibility information, and the contract unambiguously delegated that certification duty to Res-Care, the only party with the information necessary to determine eligibility of its own employees. *Id.* at ¶ I. B. 2. a.

Mountain State does not dispute Res-Care's responsibility for certification of eligibility of participants.  Rather, Mountain State argues that along with this responsibility came a duty to notify

---

[2] The parties agreed that West Virginia law would govern all disputes between the parties. *Administrative Services Agreement*, ¶ IV. L.

Mountain State when employees became eligible or ineligible.  Mountain State also references express language in the contract to support its contention. Mountain State was charged with "[m]aintenance of participant eligibility data based upon information supplied by [Res-Care]." *Id.* at ¶ II. A. 2.   At the close of the contract period, Mountain State computed the aggregate loss threshold using numbers supplied by Res-Care.  Further examination revealed that the two parties' eligibility lists differed by more than 90 employees. Either Res-Care failed to inform Mountain State of these terminations or Mountain State failed to properly remove these ineligible employees.  It is without doubt, however, that Mountain State calculated the aggregate loss threshold based upon inaccurate information.  There is no question  that many of the employees were actually ineligible for the number of months that Mountain State used in its calculation.

Nothing in the agreement prevents the parties from correcting this obvious error.  The aggregate loss threshold is computed by an objective formula, the specifics of which are undisputed by the parties.  The number of employees and their months of eligibility are essential variables in the formula.  Res-Care certifies eligibility of its employees and only Res-Care can supply the correct information regarding these numbers.  Mountain State used inaccurate information.  The fact that Res-Care may not have notified Mountain State as each employee became ineligible is irrelevant to the present inquiry. The aggregate loss threshold is inherently based upon the year-end eligibility statistics.   When Res-Care provided the accurate numbers in June of 2002, the correction should have been made.  Nothing in the agreement supports Mountain State's refusal to correct this error by properly determining the aggregate loss threshold based upon the actual eligibility information. Mountain State cannot avoid its duties under the contract by clinging to an inaccurate determination of an objectively definable calculation. Mountain State is bound by its promise to reimburse Res-Care for any amounts that exceeded the aggregate loss threshold.  *Id.* at *Appendix B,* ¶ 2, ¶ 8.  The court must give full effect to the express language of the parties. *State Auto.,* 542 S.E.2d at 880. The parties freely bargained for their respective risks and benefits contained in the contract.  Thus, Mountain

State is contractually bound to refund the amount exceeding the <u>actual</u> aggregate loss threshold. *Agreement, Appendix B*, ¶ 2.

However, this does not end the inquiry. There is no question that the aggregate loss threshold used by Mountain State is inaccurate because it was calculated using an incorrect number of eligible employees or their months of eligibility. If Res-Care's actual employee eligibility numbers are used to calculate the aggregate loss threshold, the threshold will be lower, resulting in a larger refund due Res-Care from Mountain State. This harms Mountain State to the extent that claims were paid to ineligible participants throughout the year. Since the total refund would include claims paid to ineligible employees, Mountain State would be burdened beyond what it agreed to in the contract. Res-Care cannot inflate the total amount paid during the year by including claims paid to ineligible employees. While Mountain State agreed to refund the portion of total claims paid that exceeded the aggregate loss threshold, that total amount of claims paid should only include "appropriate" claims.

The contract provided that "[a]ll claims paid during the Agreement Period shall be factored into the [aggregate stop-loss] Settlement if appropriate under the terms of this Appendix." *Id.* at *Appendix B*, ¶ 16. The payment of claims for ineligible employees is not appropriate under the contract terms. By definition, the plan covered only eligible Res-Care employees. Res-Care expressly undertook the "responsibility for claim determinations and payments under the Plan." *Id.* at ¶ I. B. 1. In fact, Res-Care flatly assumed the risk of overpayment or payments to ineligible employees. *Id.* at ¶ II. A. 3. b. "[Res-Care] recognizes that in any claims-paying process, overpayments and errors will, from time to time, occur. Losses by reason of overpayments or errors in payments that cannot be recovered [by Mountain State] shall be borne by [Res-Care]."[3] *Id.* A plain reading of this statement indicates that Res-Care suffers the loss of erroneous payments

---

[3] Mountain State is obligated, under the terms of the contract, to attempt to recover overpayments. *Agreement*, ¶ II. A. 3. b.

regardless of fault.  Therefore, it is not necessary to consider notice on the issue of determining total claims paid.

The court must give effect to the parties' intent, as expressed in the language of the contract. *State Auto.*, 542 S.E.2d at 880.  Just as the aggregate stop-loss threshold must be calculated correctly under the express language of the contract, so must the amount of the total claims paid.  Therefore, the correct refund amount is the difference between the total claims paid to eligible employees and the aggregate stop-loss threshold as determined by Res-Care's year-end eligibility information.

### *(B) Unjust Enrichment Claim*

In view of the ruling above, the plaintiff's unjust enrichment claim for reimbursement of healthcare expenses paid in excess of the aggregate stop-loss threshold is moot.

## II. Defendant's Motion for Summary Judgment

### *(A) The aggregate stop-loss proceeds*

For reasons already discussed in Part I of this opinion, Mountain State's motion for summary judgment with respect to Res-Care's claim for  reimbursement of healthcare expenses paid by Res-Care in excess of the aggregate stop-loss threshold will be denied.  Mountain State also seeks summary judgment on Res-Care's claim for overpaid fees and premiums, which is discussed below.

### *(B) The overpaid fees and premiums*

1. Express Contract Claim

With respect to Res-Care's claim for overpaid fees and premiums, Mountain State contends that Res-Care's failure to notify it of certain employees' terminations during the year absolve it  from any responsibility to return fees and premiums paid by Res-Care for these employees. In resolving this dispute, the court must examine the contract, giving effect to its express terms.  *State Auto*, 542 S.E.2d at 880.  To support its position, Mountain State points to language in the contract stating that it must maintain "participant eligibility data based upon information supplied by [Res-Care]."

*Agreement* at ¶ II. A. 2 (emphasis added). Mountain State then billed Res-Care based upon this eligibility information.

While notice cannot serve as an affirmative defense to preclude the correct calculation of the aggregate stop-loss settlement, it does affect Res-Care's claim for the return of overpaid fees and premiums. Absent notification by Res-Care, Mountain State would have no way of knowing which employees were eligible or ineligible under Res-Care's internal guidelines. Mountain State sent regular reports and bills to Res-Care. These documents noted the number of contracts being administered, the names of eligible employees, the number of claims, a description of the claims, and projected year-to-end liability. Res-Care paid monthly fees for Mountain State's TPA services as well as monthly premiums for the stop-loss coverage. These fees and premiums were paid based on the number of eligible employees, and Res-Care was required to pay them weekly.[4] *Annex A to Agreement*, ¶¶ B, E. Mountain State continued providing services for all employees for which it billed Res-Care. Res-Care received precise billing information on a weekly and monthly basis. Res-Care also possessed the correct information regarding the eligibility numbers. Only Res-Care had the ability to compare these bills and reports to its own personnel records. A comparison of the two lists would have revealed the discrepancies. As long as Res-Care continued to pay for the employees without notification to Mountain State of their ineligibility status and Mountain State continued to provide services for these employees throughout the year, payment of the fees and premiums was proper.

However, the pleadings and supplemental evidence demonstrate that the parties dispute whether notice was given regarding the ineligibility of the employees in question. "At the summary

---

[4] These payments were markedly different in nature from the aggregate loss settlement discussed in Part I. The fees and premiums had to be paid on a regular basis throughout the year while the aggregate loss settlement could not be determined until the close of the contract period. This fundamental difference explains why Mountain State's notice defense may be viable only for Res-Care's claim for the return of fees and premiums.

judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2511 (1986). Viewed in the light most favorable to Res-Care, there is enough evidence for a reasonable jury to find in favor of Res-Care on this issue. Jennifer Wiseman, the Res-Care employee responsible for notifying Mountain State of terminations, claims that she did notify Mountain State of some of the employees in question (Hanglein Depo, 32; Wiseman Depo., 12). Ms. Wiseman indicates there are archived emails containing proof that she notified Mountain State's representative of "most" of the disputed employees' terminations. (Wiseman Depo, 29-31). Mountain State asserts that it has reviewed records during discovery and has found no evidence that it ever received notice of these terminations. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of judge. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 106 S.Ct at 2513. A reasonable jury could find Ms. Wiseman's testimony credible; and if Res-Care produces these archived emails or faxes, the evidence could support a conclusion that Res-Care did notify Mountain State. As a material issue of fact is in dispute, Mountain State's motion for summary judgment on the express contract claim for overpaid fees and premiums will be denied.

> 2. Unjust Enrichment Claim

Mountain State also moves for summary judgment with respect to Res-Care's alternative theory of unjust enrichment. Res-Care claims Mountain State will be unjustly enriched if it is retains the overpaid fees and premiums. However, unjust enrichment claims are quasi-contractual in nature and, therefore, "may not be brought in the face of an express contract." *Holland v. Cline Bros. Mining Co.*, 877 F.Supp. 308, 316 (S.D.W. Va 1995) (quoting *Acorn Structures, Inc. V. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988)). West Virginia has adopted the general rule that a claim for unjust enrichment is "based on the equitable doctrine that one will not be allowed to profit or enrich oneself

unjustly at the expense of another." *Copley v. Mingo County Bd. of Educ.*, 466 S.E.2d 139, 145 (1995) (quoting *Associated Wrecking and Salvage Co. v. Wiekhorst Bros. Excavating & Equip. Co.*, 424 N.W.2d 343, 348 (1998)). West Virginia also recognizes the established principle of contract law that "an express contract and an implied contract, relating to the same subject matter, cannot co-exist." *Holland*, 877 F.Supp. at 316 (quoting *Case v. Shepard*, 84 S.E.2d 140, 144 (1954)). It is undisputed that Res-Care and Mountain State executed an express contract, which governed the payment of fees and premiums.

The West Virginia courts have strayed from the principle that unjust enrichment claims cannot be maintained when there is an express contract in only a few instances. Res-Care cites two such cases; but, both are inapplicable to the facts at bar. In the first case, the plaintiff agreed to perform "clearing and grubbing" services on 91 acres of land in exchange for a set payment. *Marshall v. Elmo Greer & Sons, Inc.*, 456 S.E.2d 554 (W. Va. 1995). The defendant permitted the plaintiff to continue clearing an additional 110 acres, but refused to pay the plaintiff any more money. The reviewing court affirmed the lower court decision that the plaintiff's express contract action must fail, but it reversed a summary judgment ruling denying the plaintiff's claim for unjust enrichment. *Id.* at 556-59. Noting the agreement's failure to specify the amount of clearing to be done, the court held that the "written contract does not preclude a consideration of any implied contract claim." *Id.* at 559. Essentially, the court allowed for the possibility of the plaintiff being compensated for the additional personal services he rendered.

The case at bar is distinguishable. This agreement between Res-Care and Mountain State is not a personal services contract. There is no gap in the contract regarding the extent of performance. Under the agreement, Res-Care paid fees and premiums per employee and Mountain State billed according to information supplied by Res-Care.

Furthermore, Mountain State provided services in return for the money it received. Unjust enrichment exists when a party "has and retains money or benefits which in justice and equity belong

to another." *Dunlap v. Hinkle*, 317 S.E.2d 508, 512 n. 2 (1984).  While Res-Care did pay fees and premiums for ineligible employees, Mountain State performed services in exchange for these payments.  Mountain State administered the contracts for these employees under its duties as TPA and even paid claims for some of these ineligible participants.  This situation does not compare to one in which an individual was not compensated for his labor in a personal services contract where the contract failed to identify the amount of work to be done.

Using the second case as precedent, Res-Care urges this court to reform the contract due to supervening events.  *McGinnis v. Cayton,* 312 S.E.2d 765, 775 (W. Va. 1984) (Harshburger, J. concurring).  The majority opinion rests on the issue of mutual mistake, which has not been raised in the case at bar.  Therefore, it is the concurring opinion upon which Res-Care relies.  Notably, the concurring opinion itself cautions that applying "equitable principles such as reformation and specific performance into the predictable contract law structure is rare and discouraged."  *Id.* at 772. It also notes that unjust enrichment may be appropriate when there is some important supervening event, "such as a change in value of natural resources over extensive time periods and their effects on contracts." *Id.*  In *McGinnis,* the parties disputed provisions of a contract that was drafted some 80 years prior to the suit.  The changes in the land and the value of the natural resources, which were the subject of the contract, were vital.  There is no such instrumental intervening event "working to undermine the purpose of the contract" in the case at bar.  *Id.* at 775.

As there is an express contract between Res-Care and Mountain State, Res-Care's claim for unjust enrichment fails as a matter of West Virginia law.  Mountain State's motion for summary judgment on the unjust enrichment claim for overpaid fees and premiums will be granted.

cc:      Counsel of Record